Mc’Kinney, J.
sitting under a special commission with Haywood, J. the other judges being incompetent to sit, delivered the opinion of the Court.
In this case the hill charges that Dudly Cox died in 1813, leaving a considerable estate, real and personal, in the county of Jefferson, in this State ; that he made a last will and testament, in which he appointed the defendant, William Cox, and Robert Massengill executors; that the said William Cox alone had the will proved in the county aforesaid, and took upon himself the execution thereof; that, by said will, the lands of the testator, of which the land in dispute was a part, were to be divided by the executors of said will among the aforesaid children of the said Dudly. Bill further stated that William Cox the elder devised to his two sons, Reed Cox and William Cox, a tract of land, situate on Mossy Creek, in said county, containing about two hundred acres; that William Cox the younger sold and conveyed his half of said tract to Dudly Cox, his brother; and Reed Cox sold his half of said tract to Christopher-Haynes, for $ 1,200, which was paid, and gave him a bond for the *356 title; that Haynes gave said tract of land to Hill, his son-in-law; and that the said Haynes and Hill, by their tenants, remained in possession of said land for a number of years; that the said Dudly Cox, who was the owner and possessor of the lower division of said tract of land, by purchase from William Cox the younger, was also desirous of purchasing the upper division, the place now in dispute, from Hill, and for that purpose applied to Reed Cox, his brother, as his agent, to purchase said land from Hill; and that the said Reed Cox, as agent of the said Dudly, did actually purchase said land for said Dudly, at the price of $ 850, — part in money, and part in property; and that the said Dudly took possession of the same, and paid the whole consideration money, with the consent of the said Hill, and received the profits until his death, and made improvements on said land; that after the death of Dudly Cox, the complainant, as guardian of his children, took possession of said land, and received the rent from the tenants, in the year 1813, and for some time afterwards; that some time after the death of Dudly Cox, Reed Cox set up a claim to the land in dispute, and procured an instrument of writing from the tenants in possession that they would pay him rent for the land, and hold it as his tenants ; that he afterwards sold said land to William Cox, the other defendant, who sold the same to Parry Talbert, who purchased the same for Ross Talbert, his son, to whom, by the direction of William Cox and Parry Talbert, Reed Cox executed a deed for said land; and that the said Parry Talbert and Ross Talbert, at the time of said purchase and taking possession of said land, well knew and were fully cognizant of all the circumstances and facts in any way connected with the claim of Dudly Cox to said land, and his interest therein. The prayer of the bill is that the title of said land may be vested in the heirs and devisees of Dudly Cox, and that Parry Talbert and Ross Talbert may account for the profits of said land, and for general relief.
The answer of Reed Cox admits that complainant is guardian of Dudly Cox’s children, and also the sale by respondent to Haynes of the land in dispute, and his execution of a title bond to Haynes; it also admits the gift by Haynes to Hill, his son-in-law, and that possession accompanied said sale and gift; admits that he purchased back the land from Hill, at the price of $850,— part in money, and part in horses,— and took up his title bond from Hill; admits that, before he repurchased from Hill, he persuaded Dudly Cox to purchase said land, and, to induce him to do so, offered to let him have it on easy terms, and that it was finally agreed between them that Dudly should have the land, and pay Reed for it $ 850, in flour and whiskey, at Ditto’s Landing, in Madison County; admits that Dudly Cox took possession of the land in pursuance of that agreement, and that complainant continued that possession after his death; denies that he purchased said land from *357 Hill as the agent of Dudly Cox; admits the sale of the land to William Cox, who sold the same to Ross Talbert, by the agency of Parry Talbert, and received the consideration ; admits that Dudly Cox and his executor paid Hill $275, in part payment of the debt due by Reed Cox to Hill for the price of said land, and that a tender of horses was made by Dudly Cox to one Thompson, who held by assignment a note for $ 200, given by respondent. to Hill for said land, by which tender respondent, in a suit brought against him by said Thompson, was exempted" from a recovery; states that after he purchased from Hill, and had sold to Dudly Cox, it was agreed that Dudly Cox should become paymaster to Hill for respondent’s notes, for which he gave Dudly Cox a horse, worth - dollars; states that he applied to the executor, William Cox, for the balance of the money due from the estate of Dudly Cox for the price of said land; that the executor refused to pay, and that he instituted a suit for the recovery of said debt, and afterwards dismissed said suit, being advised that he could not recover, and also that he was advised to get peaceable possession of the land, which he did, and took from the tenants an instrument of writing, in complainant’s bill set forth; states also that Dudly Cox was indebted to him in a greater sum than the $ 275 paid to Hill, and exhibits an account with his answer of the balance due him, but admits that on the death of Dudly Cox, his books exhibited a balance due from respondent of $ 65.30, which sum he paid to said executor, and he relies on the Statute of Frauds and Perjuries and the Statute of Limitations as a bar to any relief prayed for in complainant’s bill.
The answer of William Cox admits that he is the executor of Dudly Cox, and that Neal is the guardian of the children, and that Dudly Cox devised all his lands on Mossy Creek to his daughters, to be equally divided between them ; insists that the .estate of Dudly Cox is indebted to him $190, but exhibits no voucher for said debt; admits the sale by Reed Cox to Haynes, and the gift by Haynes to Hill, but states that he knows nothing, of his own knowledge, of the contract between Reed Cox and Hill, when said land was repurchased, but that Dudly Cox had told respondent that he had made a verbal contract with Reed Cox for said tract of land, and was to give the same amount in whiskey and flour that Reed Cox had given Hill; and that, by a subsequent agreement, Dudly Cox was to pay Hill, instead of paying said whiskey and flour, for which he received a horse’ worth between seventy-five and one hundred dollars; that he does not know how long Dudly Cox was in possession of said land before his death, nor what improvements he made, nor how long complainant was in possession after the death of Dudly Cox; admits that Dudly Cox took up one of Reed Cox’s notes, for $ 200, from Hill, and gave his own for .$ 212, which was afterwards paid *358 to Hill, and also a horse, at $ 75, and also that a tender of horses was made by Dudly Cox to one Thompson, by which Reed Cox was exempted vfrom the payment of another note of $ 200; admits that Reed Cox instituted suit against him, as executor of Dudly Cox, to recover the balance of the money due from the estate of Dudly Cox for said land, which suit was afterwards dismissed without trial; admits that certain persons, by the name of Sims, were in possession of said land, who gave up the possession to Reed Cox rather than stand a lawsuit, and respondent drew the article of agreement between said Sims and Reed Cox, which is exhibited in the complainant’s bill; states that Reed Cox was indebted to him $ 250; that he purchased said tract of land from said Reed Cox, and discounted said $ 250 out of the price, and after-wards sold the same to Parry Talbert for $ 700, which sum the said Parry Talbert paid; and by his directions Reed Cox conveyed said land to Ross Talbert, the son of Parry Talbert; does not state what sum he gave Reed Cox for said land.
The answer of Parry Talbert, for himself, and as guardian for his son, Ross Talbert, admits that he purchased said tract of land from William Cox, for the sum of $700, which he states he paid ; that Reed Cox made a deed for said land, to Ross Talbert, on the 28th day of October, 1814 ; and that he, Parry Talbert, has had possession of said land ever since, and has made some improvements on the same; admits that he was informed by Dudly Cox, in his lifetime, that he had made á verbal contract with Reed Cox for said land, and that Reed Cox told him so likewise, but said he could not get his pay from the executor, and, as there was no writing on either side, that he had a right to sell the land ; admits also that he heard of Neal, the guardian, receiving the rent for said land after the death of Dudly Cox, but did not know under what claim; and states that he thought Reed Cox had a good right to sell said land, and that under that idea he bought the same from William Cox, and paid him, and insists that Ross Talbert has a right to hold the same.
It is very satisfactorily made to appear from the answers and depositions taken in this case that Parry Talbert and Ross Talbert, at the time they purchased and received a deed for said land and for long before that time had a full and perfect knowledge of the situation of said tract of land, of the claim of Dudly Cox and his heirs and devisees to said land, and of the possession that had accompanied said claim.
It also appears that Reed Cox, when he got said land from Hill, gave 'five notes to said Hill, — four of $ 200 each and one of $ 50 ; that of these notes Reed Cox paid the fifty-dollar note, as appears from Hill’s deposition, and that a judgment was got against him on one of the $ 200 notes, which it may be he has also paid; another of these notes for $ 200, Dudly Cox paid, by taking it up and giving his own note for it; and another of *359 these notes Reed Cox was sued on in Madison County, and by pleading a tender made by Dudly Cox of horses be barred a recovery, as appears by the record of said suit, produced in evidence; of the remaining $ 200 note we have no account, except that Dudly Cox paid $ 75 on it in a horse; for it is in proof, and admitted in the answer, that he paid a horse at that price, and there was no other note to which it could be applied; it may, therefore, be fairly presumed that Dudly Cox paid that note, as Hill, in his deposition, says the two notes he assigned to Thompson were the last he had, and Reed Cox, in his answer, does not pretend that he has ever been called on to pay said note; unless, therefore, Reed Cox can make it appear before the clerk and master how that note has been otherwise disposed of, it will be considered paid by Dudly Cox.
As to the account exhibited with Reed Cox’s answer, it is not deemed material to notice it, because no proof -is offered to support, and because it is thought he would have no right to set it up in this case, seeing his remedy was against the executor, if he had any just account; and because his paying the $ 65.30 to Dudly Cox’s executors is presumptive evidence that the balance was on that side.
On the foregoing statement of facts, collected from the answers and depositions, the question arises, is the complainant entitled to the relief prayed for in the bill ?
It is contended for, on the part of the defendant’s counsel, that the relief prayed for by the complainant’s bill cannot be granted for the following reasons: —
First, because, by a sound construction of our Statute of Frauds and Perjuries, in no ease can a contract be enforced unless it has been reduced to writing, and signed by the party to be charged thereby. Herein they contend that as the contract between Reed Cox and Dudley Cox was a verbal one not reduced to writing, a specific execution of it ought not to be decreed.
Second, because, even if the construction put upon the Statute of Frauds and Perjuries in England, from which ours is copied, were to be adopted, still it is contended that here is not such a part performance as would entitle the complainant to the relief sought in his bill.
Third, there is such a variance, it is contended, between the agreement stated in the bill and that which is admitted in the answers and proof, that even if the other points of the case were with the complainant, still he would not be entitled to a decree in his favor. And to support the foregoing propositions, many books have been read and many authorities cited.
The great object of courts is to do justice, but in attaining this object, general rules must not be violated, for it is better that a particular case of hardship should remain unredressed, rather than a rule should be violated, the violation of which would occasion much mischief.
*360 This case has an unpleasant aspect, to say no worse of it; to see two surviving brothers combining to defraud the orphan children of a deceased brother is an affecting sight, inasmuch as it not only indicates a want of honesty, but likewise a want of the common feelings of humanity; and if a court of chancery could not give relief in a-case situated as this is, it would at least be matter of regret.
It is believed that this is a case in which the Statute of Frauds and Perjuries does not operate for several reasons.
First, because William Cox was a trustee for the complainants, that is, for the children of Dudly Cox; he was so constituted by the will of Dudly Cox, the execution of which he had undertaken, under the solemn sanction of an oath; he had been directed by the will of Dudly Cox to divide the land of said Dudly Cox, of which the land in dispute was a part, among his children, and he took an oath that he would do so. When he qualified as executor, and to enable him to have complied with the trust he had undertaken, it was his duty to have freed this land from any encumbrance which lay upon it; he had it fully in his power to have done so, for he does not pretend a want of assets. Reed Cox was willing to have taken his pay and to have conveyed the land; and to compel the trustee to do his duty he instituted a suit which was afterwards dropped, evidently by collusion ; and what makes the matter appear still worse on the part of William Cox is, that he took out of the hands of Reed Cox $ 65.30, which ought to have gone in part satisfaction of the money due to'Reed Cox for this land. William Cox being therefore a trustee, for the children of Dudly Cox, the law will not tolerate him to make a purchase to the prejudice of his cestui que trust; no, not even if he did it honestly, and much less if he does it fraudulently and collusively; and if he does make such purchase, and take a deed, he will be still held a trustee, and will be compelled to convey to him who has the equitable right to the purchased property, and if he procures a deed to be made to some third person, who derives his title through the trustee, and takes it with notice, he shall be a trustee also. Piad William Cox, by virtue of his purchase from- Reed Cox, taken a deed to himself, he would have still held the land in trust for Dudly Cox’s children ; and Ross Talbert is in the samo situation and no better. It is in vain to say that this case is within the Statute of Frauds because there is no writing binding on Reed Cox, for here is a deed of conveyance from Reed Cox to a person who is indubitably a trustee for the complainant’s wards. In support of the position here assumed, let us refer to a few of the cases cited in the case of Davoue v. Fanning and others, in 2 Johnson’s Ch. Cas. 252; in the case of Holt v. Holt, 1 Ch. Cas. 190, it was held by Lord Keeper Brayman, assisted by the judges, that if an executor in trust renewed a lease, it should be for the benefit of his cestui que trust; in the case of Keech v. Sandford. before Lord Chancellor Kenyon, 3 Eq. *361 Cas. Ab. a lease of the profits of a market was devised to a trustee, in trust for an infant; before the expiration of the term, the trustee applied to the lessor for a renewal for the infant’s benefit, which he refused, because he could not distrain, but must rest singly on a covenant, which the infant could not make. The trustee took a lease to himself, and the Chancellor decreed that the lease should be assigned to the infant, and that the trustee should be indemnified from the covenants, and the trustee account for the profits since the renewal; he said he must consider it a trust for the infant, for if the trustee, on refusal to renew, might have a lease to himself, few trust estates would be renewed to the cestui que trust, and though it might seem hard that the trustee was the only person of all mankind who might not have the lease, yet it was very proper that the rule should be strictly pursued, and not in the least relaxed, for it was very obvious what would be the consequence of letting trustees have the lease on refusal to renew to cestui que trusts. Now let us pause for a moment, and apply the principle recognized in the two last-named cases to the one now under consideration. What' would be the consequence of letting an executor purchase up, for his own benefit, lands of which his testator had been in possession, or to which he had an equitable right ? The testator’s papers fall into his hands of course; among them he may find unregistered deeds, or title bonds, or other written memorandums, of contracts concerning land, and how easy would it be for him, in all these cases, to collude with the former owner of the land, and by dividing the spoil defraud the heirs of the testator, if he were allowed, in a case like this, to become a purchaser for his own benefit. The same principle is recognized in Bos. and Pull. 376, and so far is this principle extended, that a trustee is not permitted to purchase from his cestui que trust, unless he has first fairly discharged himself from his office of trustee, and placed himself in circumstances to make a fair contract; see 2 Brown, 400; 6 Vesey, 627; 9 Vesey, 247; and 2 Atk. 59; neither are trustees permitted to purchase at their own sales, no matter how fairly and honestly they may demean themselves; see 5 Vesey, 678; 13 Vesey, 600; and in Sugden, 434, it is laid down as clear law, that a person purchasing with notice from a trustee, is liable to the same equity the trustee himself was subject to.
It is to be remembered in this case that Reed Cox is the only defendant who relies on the Statute of Frauds, &c. as a defence, and it does not lie in his mouth to say that the contract is not reduced to writing, after he has made a deed to the trustee; and although the other defendants, it is believed, could not have availed themselves of a defence under the Statute, still, it is enough here to say that they have not relied on such defence.
But again, if Reed Cox purchased the land from Hill, as the agent of Dudly Cox, Dudly Cox, as an appendage to that purchase, had a right to the title bond which Hill had on Reed Cox, and a Court of Chancery will *362 consider him entitled to the benefit of said bond ; and notwithstanding the denial of Reed Cox, there are very strong circumstances in this case, going to show that Reed Cox did purchase it as agent for Dudly Cox ; but, before remarking on this part of the case, it is deemed material to cite a part of Reed Cox’s answer, verbatim: “Your respondent had bought a piece of land in Madison County, and being about to move out of the State, he was desirous of settling the dispute before he went away; and was also desirous to 'part with the lands, as it did not suit him to have lands at such a distance from him; in pursuance of these views, he applied to Hill, who by this time had become the owner, and made a verbal agreement with Hill for the purchase, but as Hill had not the bond with him for the title, the completion of the bargain was put off to a future day, when Hill was to produce the bond, and the contract was to be reduced to writing, which was, at the time appointed, completed; the title bond was given up, and this respondent executed his bonds, part for money, and part in property, for $ 850, the consideration money to said Hill; that at the time the verbal agreement was made Dudly Cox was at home ; he then lived with this respondent, at whose house the agreement was made, but was not present at the time the contract was reduced to writing. After the verbal agreement was made, and before it was reduced to writing, he pressed said Dudly Cox to become the purchaser, who objected, on the ground that he was already much indebted ; this respondent insisted on him, as he owned the other half, to make the purchase ; amongst other considerations, proposed that he would make the terms easy. He finally agreed to take the land,” &c. Now it is very evident, from this part of Reed Cox’s answer, that he did not purchase the land from Hill with any design of being himself the owner of it, and, to use his own words, before the contract between Plill and him was reduced to writing, Dudly Cox had agreed to take the land off his hands, and from his own showing, was he not the agent of Dudly Cox ? For if A says to B, do you purchase a tract of land from C, and I will immediately purchase it from you, what is the real intention of the parties in this transaction ? Why, that A is to become the owner of the land, and B is the agent or instrument, by which that object is to be effected, for the law looks more to the nature than the name of a transaction; and this idea is still more favorably presented to us if we look at the situation of these parties. Reed Cox was going to move away, and of course had no wish to become the purchaser of land in that part of the country, as he himself tells us, but before he went away he wanted to settle a dispute that existed between Haynes and him, about the boundary of the land he had sold to Haynes. Plow was it to be settled ? The most effectual way was to get some person to purchase the land, who would have no interest in keeping up said dispute ; and Dudly Cox was that person, for, as he owned the other half of said tract, when he would become owner of the *363 whole, the dispute would of course cease, about a division of said land, and as Dudly Cox was present when the verbal contract was made between Reed Cox and Hill, it was doubtless the understanding of all parties, that Dudly was to be the owner of the land as soon as Hill parted with it; and this idea is strengthened by adverting to the circumstances following the transaction immediately; Reed Cox, though he is living on land not his own, does not take possession of this land, but Dudly Cox does, and continued it until the time of his death, and made improvements on it, as Reed Cox, in his answer, admits. And here a question arises, if Reed Cox purchased this land from Hill with an existing agreement that Dudly Cox should immediately become the owner of the land, if Dudly Cox becoming the owner of the land was the principal object to be obtained by the transaction, was not Dudly Cox, in equity, entitled to the benefit of the bond, which Hill held on Reed Cox ? Suppose the bond, which Hill held had been on Haynes instead of Reed Cox, would not Dudly Cox, as he. was to be the owner of the land, and really the man who was to pay the purchase money, would not he have the interest in this bond, and under such circumstances would not a Court of Equity give him the benefit of it, and even set it up if it were lost ? If this would have been the case if the bond had been on Haynes, does the circumstance of its being on Reed Cox make any difference ? Now, if Equity -would set up this bond, either against Haynes or Reed Cox, there is an end to the objection about this contract not being reduced to writing; and ‘it is not to be forgotten, in this case, that Reed Cox, in two separate places in his answer, states that the contract between him and Hill was reduced to writing; what writing was that, for it will not do to say that the execution of the notes to Hill for the purchase money will explain this expression in the answer ? Reducing a contract to writing is a technical term, and he who uses such term is always supposed to understand its meaning. Was there, then, a relinquishment made on the back of said bond by Hill, and if so, for whose benefit was it made ? Was the relinquishment máde to Dudly Cox or Reed Cox P Why was not this bond produced ? He who has it in his power to produce an instrument of writing, and does not do it, leaves room for every presumption which naturally arises out of the transaction.
The words of the statute are, “ No action shall be brought, &c. unless the promise or agreement upon which such action is brought, or some memorandum or note thereof, shall be in writing and signed by the party,” &c. Now, observe, the statute does not say that the writing shall be given by the person to be charged therewith to the person who seeks to enforce the contract. If A makes á contract in writing with B for a good consideration, for the sale of land, if that writing comes into the hands of C, for a good consideration, either by assignment or naked delivery, C can in equity enforce the contract against A, and A cannot say, “ I did not make any con *364 tract with C, nor sign any instrument of writing' to C.” To apply this to the present case, Reed Cox gave his title bond to Haynes for a valuable consideration, for the land in dispute; that bond afterwards came into the hands of Hill, whether by assignment or naked delivery does not appear, nor is it any way material to consider; it was for a good consideration, and -Reed Cox was as much estopped to say that he was not bound by this bond to Hill, as he was to Haynes, and if, for a good consideration, it had passed through twenty hands, Reed Cox would have been as much estopped by his bond in the hands of the last person as he was in the hands of the person to whom he executed it. But it is not the mere possession of the title bond which gives the holder of it a right to call upon the maker of it for a performance of his contract in equity; it is the consideration, good or valuable, which he has given for it, and if the holder of the bond should lose it, he does not thereby lose his remedy in equity. Reed Cox was then liable to Haynes on his bond, because he received from Haynes the purchase-money. Reed Cox was liable to Hill on this bond, because he acquired the equitable interest in it by gift from his father-in-law, which was a good consideration. Reed Cox is liable to Dudly Cox in equity on this same bond, because Dudly Cox became responsible to Hill for the price of the land, and actually paid the greater part thereof, and that by the special request of Reed Cox himself. As then, Dudly Cox, by the .procurement of Reed Cox, acquired an equitable interest in the land specified in the bond given by Reed Cox to Haynes, he also acquired an equitable interest in the bond itself. Reed Cox can no more be heard to say, under the circumstances of this case, to Dudly Cox, that there is no instrument or note in writing binding him to convey this land, than he could have been heard to say so to Haynes, to whom he gave the bond. Is it not within the legitimate power of a Court of Equity to compel the delivery of that bond to complainants, if it be in existence, and if destroyed,' to set it up for their benefit ?
If in this case it be at all necessary to decide the question whether a Court of Chancery will, in any, case governed by the laws of the State, decree the specific execution of a contract which has net been reduced to writing and signed by the party to be charged thereby, it is believed there are certain cases where such contracts ought to be executed specifically, although they have not been so reduced to writing, nor signed. And if it be asked how far is this principle to be extended, the answer is, just as far as it can be safely done, without incurring any of the evils intended to be guarded against by the statute, and no farther. But it is contended by the defendant’s counsel in this case that the statute should receive a literal construction. Well, be it so. But what is a literal construction of this statute? The statute says “ that no action shall be brought whereby to charge any person upon any contract for the sale of lands, tenements, or hereditaments, *365 unless the promise or agreement upon which such action shall he brought, or some memorandum or note thereof, shall he in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized.” Now, what is a contract in the contemplation of the Legislature at the time of passing the Act ? A contract is simply an agreement for a good consideration to do, or not to do, a thing. Well, let it be the established construction of the statute that when there is a naked contract and nothing more, and that contract is not reduced to writing, and signed by the party to be charged therewith, or by somebody by him thereunto lawfully authorized, that neither in law nor in equity shall that contract be enforced ; still the Legislature did not say, and it is believed it did not intend, that in a case where there is not only a contract, but also something more, that in this latter case the contract shall not be enforced ; that is to say, the statute was not meant to embrace a case where the con- . tract has not only been made, but also so far executed that its existence can be proved without danger of perjury, and when it would be a fraud in the contracting party to refuse to complete the remainder of the contract. Hence, in all cases where a specific performance of a contract for the sale of land is asked for by a bill in chancery, and the contract, as set out in the bill, is substantially admitted by the answer, and open and notorious possession on the part of the person seeking a decree has accompanied the contract, and the whole or the greater part of the purchase money has been-paid or secured, or has been refused by the seller; such a case as this, it is believed, is not embraced in the statute, because in such a case there is no danger of perjury, and to adopt a different rule would be to encourage fraud, not to prevent it. It is to be observed that there is a marked distinction between a case at law, where the statute is relied on to bar the plaintiff’s claim, and a case in equity, where the same statute is relied on as a defence; because, in the former case, the establishment of the plaintiff’s demand or cause of action, if it be resisted, must rest altogether on the testimony of witnesses, who may be induced to commit perjury ; whereas, in a court of chancery, you have the statement of the defendant on oath, who-will not be likely to admit more against himself than is true. Why is a contract evidenced by writing to be carried into effect, when one that is made apparent only by parol evidence is to be rejected F Is it not because the writing is evidence of a higher nature and accompanied with more certainty than parol proof? But can it be said that a writing, signed by the partyand attested in the most solemn form, is bet-t )r evidence of a contract than a writing drawn up by the aid of learned counsel, signed by the party, and sworn to in a court of justice, as is the answer to a bill in chancery ? Indeed, it is exceedingly doubtful if the framers of the British Statute of Frauds and Perjuries had their attention at all turned to a Court of Equity, or if they meant anything more than *366 to say that where a person brought a suit in a court of law, in certain cases, that unless the contract on which he founded his action was reduced to writing, he should not he permitted to recover; it is very certain that the words of the Act do not embrace proceedings in chancery, but it has been determined, and very properly, too, that proceedings in chancery are to be governed by the spirit of the statute. But what is the spirit of the statute ? in other words, what did the framers of that statute mean when they passed it ? The answer is, they intended to prevent fraud from being perpetrated by the commission of perjury, or, in other words, they intended that persons should not be defrauded of their property by the oaths of false witnesses. But surely they never intended that in a case where a contract was fairly and honestly made, and could be established without any danger of the commission of perjury, that such a contract should not be enforced. Suppose A sells a tract of land to B, and puts him in possession, and receives the whole of the purchase money, and promises to make him a deed of conveyance as soon as it can conveniently be done, and by neglect, as often happens, the deed is not executed as soon as was contemplated, and, in the mean time, B dies and A becomes insolvent; in this case, shall the heirs of B lose the land, because A, although he confesses this whole matter in his answer, is dishonest enough to insist on the Statute of Frauds, &c. as a de-fence ? Suppose the framers of the statute had been asked, when they were about to pass it, if they intended to embrace such a law as this, what would the answer have been ? It is believed they would have said no. Indeed, to give the statute that construction, would be perverting it from the use for which it was intended, that is, a shield to guard against fraud and perjury, and would be converting it into a sword with which to wound Justice in her own temple. It is believed that there is great force in the argument used at the bar by the complainant’s counsel, that the British statute had been long in force at the time our statute was passed, that many decisions had then been made in it, establishing the doctrine here laid down. These decisions were well known to the Legislature, and if they had intended to guard against any construction put upon the statute in England, they would certainly have used words to convey that intention. It is very obvious that they merely meant to put into our statute-book a statute which, it is believed, had, not long before the passage of that, been decided not to be in force in this State. Hence, they enacted a literal copy of the British statute, but had no intention of changing the law in that particular ; for the law in England, at the time of the passage of our statute, was not only the statute itself, but also the decisions that had been made in the courts of that country on that statute. It is, however, admitted that the English decisions on their statute are contradictory and irreconcilable, and that, to prevent particular instances of hardship, courts of that country have given the statute too extended a construction, and that they are now in *367 some measure retracing their steps. But it is believed that in no case decided in that country on their statute, is there any doctrine laid down which is not perfectly reconcilable with the doctrine here stated. It is also believed that, as we are yet unshackled with any decisions in our own courts on this statute, and are not bound by the English decisions further than as they appear to be founded in good sense, we ought to give this statute a very strict construction, so as to guard against the evils which the Legislature meant to prevent.
On the second point in this case, viz. whether there is such a part performance of this contract as will prevent this case from coming within the operation of the statute, it is believed this is a stronger case of part execution than can be found in the books. Here is an absolute contract for the sale of the land in dispute, possession open and notorious accompanying that contract, and is continued until the death of Dudly Cox, and is after-wards continued by the guardian of Dudly Cox’s children, all which is admitted by the answer, and satisfactorily proved; the greater part of the purchase money is paid, and the payment of the residue is prevented by accident or the act of God, for there is no doubt, if Dudly Cox had lived, the whole of the money would have been paid, and no dispute would, in all likelihood, have taken place ; Reed Cox acquiesces in his brother’s possession until the time of his death, and for some time after; stands by and sees his brother and his representatives making payments for this land, and making improvements on the land, and makes no objection of any kind; he does more, he institutes a suit to recover from the executor of Dudly Cox the balance of the purchase money not paid, by which act it is very doubtful if he did not take the case out of the statute, even supposing it otherwise to have been within it; for if a declaration was filed in that case, in which declaration the terms of the contract respecting the sale and purchase of the land were set out, it is at least doubtful if he would not ever afterwards be estopped by evidence of a higher nature even than writing, viz. by a record to say that there was no such contract. At length, however, he colludes with the executor, and the suit is dropped, and he and the executor collude with the tenants on the land, and the possession is wrested from the infants; then Reed Cox and William Cox and Parry Talbert all collude together, and the land is sold to William Cox, and he sells it to Parry Talbert, and by and by we see the title vested in Ross Talbert; then here are some infant children before the Court suing by their guardian, who labor under many disadvantages. If Dudly Cox, their father, were before the Court, he could probably furnish evidence in this case which they cannot. The papers of their father have fallen into the hands of an executor, of whom it shows no want of charity to say that he has acted unfaithfully; and as he has evidently disregarded the obligations of one oath, perhaps he is not so much to be credited when *368 lie says in his answer that he has given up all the papers relating to this transaction, and that he never saw any writing from Reed Cox to Dudly Cox, respecting this land. Now, this may be all true, and yet he may have seen an assignment on the title bond from Hill to Dudly Cox, or he may have seen that bond itself among Dudly Cox’s papers. When we see him drawing and witnessing an instrument of writing between Reed Cox and the Sims’s, the effect of which was to dispossess the infant children of Dudly Cox of that very land which it was his duty, as executor and trustee, to have preserved for them, that he might afterwards divide it among these ■ infants, according to the terms of the will, the execution of which he had taken upon himself; and when we see him afterwards becoming a purchaser of that land himself, to the prejudice of these infants, we may reasonably suspect him of concealing papers. The defence set up by Reed Cox, that he could not enforce the payment of the balance of the purchase money from the executor, is not tenable ; for without determining whether he could have done so in a court of law ormot, no doubt is entertained that, if he had filed a bill for a specific performance of the contract, and made the guardian party to that bill, he could have had the contract executed, if he had shown that he was ready and willing on his part to complete the same.
It is also believed that the third objection on the part of the defendant is not tenable. The cases put in the books, where the Court would not grant a specific execution of the contract, because the contract set out in the bill was different from that admitted in the answer, or made out by the proof, were cases where the result would have been different, that is, the decree would have been different; in the case of Lindsey v. Lynch, 1 Sch. and Lef. the agreement set out in the bill was for a lease for three lives ; the agreement admitted in the answer was for a lease for one life, and the measure of the relief would be very different on one of these agreements from what it would be on the other, inasmuch as a decree for a lease of three lives would be very different from a lease for one life; but, in the case before the Court the decree will be the same whether we execute the agreement set out in the bill, or that admitted in the answer; the complainant says, you purchased the land in dispute from Hill, as the agent for Dudly Cox, who took possession under Hill and became responsible to Hill for the purchase money, and I want the title to this land vested in the heirs of Dudly Cox by a decree of the Court; no, says the defendant, Dudly Cox. purchased this land from me, and took possession under me, and it was by an agreement with me that he made himself liable to Hill for the purchase money. Now, does it require any argument to prove that the deeree must be to all intents and purposes the same whichsoever of these statements we take to be true, that is, a decree to vest the title in the heirs of Dudly Cox ? The only difference it makes whether the statement in the bill or *369 the answer be true, in tliis respect, is as to the right to obtain the relief sought for, and not as to the measure of the relief to be obtained; for, if Dudly Cox took possession under Hill, he would, in equity, be entitled to the benefit of the title bond from Reed Cox.
Norn. — There is an intimation thrown out in this case, that there may he cases of sales of land not in writing, which ought to be specifically executed. But this is overruled in Patton v. M’Clure, M. & Y. 342 and 391, citing this case, a ruling which has since been followed. — Ed.
Decebe. — That the clerk and master take an account in this case, in doing which he shall state how much Dudly Cox was to pay Hill, for Reed Cox, on account of the land in complainant’s bill mentioned, to which he shall add $ 37.50, half the price of the horse which Reed Cox let Dudly Cox have, to become responsible to Hill for the price of said land.
Also, how much Dudly Cox, or his representatives, have paid on account of said debt to Hill, in doing which he shall allow a credit for the $ 200 note taken up from Hill, and also for the $ 200 sued for in Alabama, and also for the $75, part of another note of $ 200, paid in a horse by Dudly Cox; and he shall give credit for the whole of the said $200 note, of which that $ 75 was part payment, unless Reed Cox shall make it appear satisfactorily before the master how said note has been disposed of, and that he is liable for’it, or has heretofore paid it; that the clerk and master shall deduct the sums paid by Dudly Cox, or his representatives,' at the times they were paid, from the whole sum due to Hill or to Reed Cox, and shall report the balance due, with interest.
The master shall also take an account of the rents and profits of said tract of land, from October,'1814, up to this time, and shall charge Parry Talbert therewith, and shall give the said Parry Talbert credit for any permanent improvements made by him on said land, in doing which he shall only allow a credit for improvements to the extent that the value of said land is enhanced by said improvements, and on stating a balancq Jin the account between the value of said rents and profits, and said improvements, if the rents and profits overgo the improvements, the said Parry Talbert shall pay the same to the complainant, as guardian for the heirs of Dudly Cox. And, on payment by said guardian of the sum that shall be reported due to said Reed Cox, the title to said tract of land shall be divested out of Ross Talbert, and all others, and shall be vested in Betsy Cox, Polly Cox, and Darkey Cox, heirs of Dudly Cox, and their heirs and assigns forever; and in taking this account the master may, if he think it necessary, examine each party on oath.